COMMONWEALTH of Pennsylvania, Ernest D. Preate, Jr., Attorney General

v.

Joseph J. BURNS, Appellant.

Commonwealth Court of Pennsylvania.

Argued April 6, 1995.

Decided Aug. 8, 1995.

---

Gerald P. Deady, for appellant.

J.P. McGowan, Deputy Atty. Gen., for appellee.

Before SMITH and KELLEY, JJ., and LORD, Senior Judge.

SMITH, Judge.

Joseph J. Burns (Burns) appeals from an order of the Court of Common Pleas of Luzerne County, sitting in equity, that denied and dismissed Burns' motion for a new trial and/or judgment n.o.v. and affirmed the decree nisi entered June 10, 1993. That decree permanently enjoined Burns from engaging in unfair and/or deceptive trade practices as defined by the Unfair Trade Practices and Consumer Protection Law (Law), Act of December 17, 1968, P.L. 1224, *as amended,* 73 P.S. §§ 201–1—201–9.2, from making repairs, improvements or replacements on tangible real or personal property of a nature or quality inferior to or below the standard of that agreed to in writing and from engaging in conduct, fraudulent or otherwise, which creates a likelihood of confusion or misunderstanding.

▮ The decree ordered Burns to pay one of his customers $5,000 as restitution under Section 4.1 of the Law, added by Section 1 of the Act of November 24, 1976, P.L. 1166, 73 P.S. § 201–4.1, and to pay a civil penalty of $5,000 for the violations determined to have occurred, pursuant to Section 8 of the Law, 73 P.S. § 201–8. On appeal, Burns questions whether there is a factual basis in the record to support the order of restitution and the permanent injunction.[1]

---

1. This Court's scope of review of a civil action in equity where the chancellor has made findings of fact and conclusions of law is limited. The Court will not reverse unless it appears that the chancellor has clearly abused his or her discretion or committed an error of law. *Zitelli v. Dermatology Educ. & Research Foundation,* 534 Pa. 360, 633 A.2d 134 (1993).

## I.

In the adjudication in support of the decree nisi the chancellor found that Burns entered into a contract with Myrtle Nagle for the construction of an addition to her home, for a total price of $15,803, to be completed in 60 days. He received payment of $4,500 at the time of signing, as provided in the contract, but he requested and received another payment of $4,500 before work commenced and other payments resulting in a total of $13,500 before the work was half-completed, in advance of the contract payment schedule. After 60 days, at the end of August, Burns stopped work on the project, with the home's utilities and heating disconnected. When Mrs. Nagle was able to make contact with Burns, he informed her that he would not complete the work unless he received final payment. He never returned, and Mrs. Nagle, concerned about cold weather, engaged another contractor to complete the project, with a slightly larger deck, for a cost of $10,700. Findings of Fact Nos. 1–4.

Burns contracted with Carol Walcavage for work in the basement and on the foundation and porch of her home. He received payments totalling $3,982 before work was commenced and he demanded final payment before completion. To obtain additional funds, Burns informed Ms. Walcavage that one of her checks had not cleared; however, all the checks presented to her bank were in fact honored. Burns never completed the project. Findings of Fact No. 5. Burns also contracted with Laval Gasser for improvements to his home at a lake, including installation of a foundation, rewiring and a bedroom extension. Although he had received payment totalling $10,000, Burns performed minimal work at the site. When finally contacted by Mr. Gasser, Burns stated he required an additional payment; after receiving $2,000 more, Burns never returned. The project was eventually completed by another contractor. Findings of Fact Nos. 6–8. The chancellor made similar findings regarding a contract for repair of the walls of an in-ground swimming pool and a contract for construction of a deck and fence around a yard. Findings of Fact Nos. 9–11.

The Bureau of Consumer Protection agent who investigated complaints by the five testifying consumers stated that in each case the project was not completed and that the workmanship in what was completed was substandard. The chancellor found that the evidence showed a pattern of vagueness at the inception of the contract, of use by Burns of the incomplete status to attempt to coerce additional payments and of failure to complete contracts satisfactorily. From the findings the chancellor concluded that Burns had made repairs and improvements of incomplete or inferior quality, citing Section 2(4)(xvi) of the Law, 73 P.S. § 201–2(4)(xvi), and that the totality of the evidence showed Burns had engaged in fraudulent conduct that created the likelihood of confusion or misunderstanding, citing Section 2(4)(xvii), 73 P.S. 201–2(4)(xvii).

## II.

Concerning the award of restitution, Burns first argues that the Law applies only to the specific kinds of fraud contained in the definitions of "unfair methods of competition" and "unfair trade practices" in Section 2(4). Those relied upon by the chancellor are:

> (xvi) Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing;

> (xvii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding.

## A.

As to the Section 2(4)(xvi) violations, Burns does not challenge the factual basis for the chancellor's finding that he did substandard work on the portions of each of the projects that he did complete. Rather, he argues that such a finding as a matter of law does not constitute fraud within the meaning of that provision. He cites *Burkholder v. Cherry*, 414 Pa.Superior Ct. 432, 440, 607 A.2d 745, 749 (1992): "Even [the consumer] conceded that [the contractor] had made no representations pertaining to any special skills as a builder, and it is not enough to establish a violation of the statute that [the contractor]

had failed to fulfill the [consumers'] expectations regarding the quality of his work."

As the Attorney General points out, *Burkholder* is readily distinguished. That case involved an action by a contractor to recover payment from customers, and a counterclaim by the customers asserting a claim under the Law. The Superior Court affirmed the trial court's ruling that the customers had failed to produce evidence of fraud. In addition to the contractor's lack of representations, the consumers were unable to prove a loss, because the jury determined that the dwelling at issue was constructed in a good and workmanlike manner.

■ The Attorney General is correct that there was no need for the chancellor to recite in Conclusion of Law No. 11 that such substandard work was "below the standard agreed to in writing" to establish a violation under Section 2(4)(xvi), as that was the clear intent. Further, the Court takes note that the Nagle contract, for which restitution was ordered, includes the following:

> 2. All work shall be accomplished in accordance with the National Building Code as is described by the B.O.C.A. Code governing such building work.
>
> . . . .
>
> 4. All materials shall be new and both *workmanship* and materials *shall be of good quality.*

N.T., Exhibit 5. (Emphasis added.) Where a contractor agreed in writing to perform a contract with workmanship of good quality but is shown to have performed with substandard and inferior work, the Section 2(4)(xvi) violation is established.

### B.

Concerning Section 2(4)(xvii),[2] Burns contends that the conduct described by the chancellor—coercing consumers into making additional payments due to the incomplete nature of the project and, when the payments were not forthcoming, failing to complete the project—does not constitute conduct that creates a likelihood of confusion or misunderstanding. He relies upon *Prime Meats, Inc. v. Yochim,* 422 Pa.Superior Ct. 460, 619 A.2d 769 (1993), *appeal denied,* 538 Pa. 627, 646 A.2d 1180 (1994). There the court held that, to invoke Section 2(4)(xvii), the five elements of common law fraud must be proved, namely, (1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damages to the party as a proximate result.[3] Burns maintains that the chancellor merely summarized the testimony in his opinion and fails to refer to any findings of fact which specifically demonstrate that elements of common law fraud were found.

The Attorney General argues that full consideration of the testimony and exhibits, along with reasonable inferences drawn therefrom, supports the determination that Burns engaged in common law fraud. In the alternative, he cites federal cases and decisions of this Court employing a definition of "fraud" that is broader and more readily proved than the common law standard and urges this Court to reexamine the question of "statutory fraud" under Section 2(4)(xvii) of the Law as a concept distinct from common law fraud. Because the Court concludes that the elements of common law fraud are established in this record, there is no need to address the latter issue.

■ The chancellor's crucial finding was that Burns engaged in a pattern of using the incomplete status of projects to attempt to coerce consumers into making additional payments and of failing to complete the contracts. Although inferences based on a sin-

---

**2.** Clause (xii) of Section 2(4) is the last of the enumerated definitions of "unfair methods of competition" or "unfair or deceptive acts or practices," and its broad language has led to its description as a "catch-all provision" under the Law.

**3.** In *Prime Meats, Inc.,* which was an appeal from an order denying class certification, the Superior Court affirmed a ruling that the elements of common law fraud were not proved, where the counterclaiming defendants admitted that there was never any misrepresentation and contended only that the price of the services contract in conjunction with their contract for the purchase of meat was so excessive as to be unconscionable.

gle incident might be subject to question, the proof of a pattern of conduct justifies an inference that at the time of contract formation Burns did not intend to adhere to the specified schedules of completion of the work and of payment. Burns' representations on these matters, therefore, were misrepresentations, knowingly made, on which his customers justifiably relied to their detriment by becoming involved with Burns at all. The making of such misrepresentations constitutes "fraudulent conduct which creates a likelihood of confusion or of misunderstanding" within the meaning of Section 2(4)(xvii) of the Law.

### C.

■ Burns also states a challenge to the sufficiency of the evidence to support a permanent injunction, which he argues by way of incorporation of his arguments on the issue of restitution. The Attorney General responds that whenever the violation of a statute is found, such violation constitutes irreparable harm per se, and injunctive relief is appropriate. *Pennsylvania Public Utility Commission v. Israel,* 356 Pa. 400, 52 A.2d 317 (1947). This Court takes notice that the Law expressly provides for the Attorney General or a District Attorney to bring an action to restrain by temporary or permanent injunction any person who is using or who is about to use any unfair method of competition or unfair or deceptive trade acts or practices. Section 4 of the Law, 73 P.S. § 201–4. The adequately supported findings and conclusions that Burns committed unfair and deceptive trade practices consequently support the grant of injunctive relief. The order of the chancellor denying post-trial motions is, therefore, affirmed.

### ORDER

AND NOW, this 8th day of August, 1995, the order of the Court of Common Pleas of Luzerne County is affirmed.