J-A02037-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| J.T. THOMAS HOMES, INC., A PENNSYLVANIA CORPORATION | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 448 WDA 2025 |
| ANTHONY J. DESTEFANO AND KELLY B. DESTEFANO, HUSBAND AND WIFE | : | |

Appeal from the Judgment Entered March 17, 2025
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-20-7355

BEFORE:  STABILE, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                          **FILED: May 15, 2026**

Appellant, J.T. Thomas Homes, Inc. ("J.T. Thomas Homes"), appeals from the judgment entered against it by the Allegheny County Court of Common Pleas ("trial court") in favor of Appellees, Anthony J. DeStefano and Kelly B. DeStefano (together, the "DeStefanos") following a nonjury trial. Each party brought crossclaims for breach of their April 8, 2019 contract, in which J.T. Thomas Homes agreed to construct, and the DeStefanos agreed to purchase, a custom, new-construction residential home in Upper St. Clair Township (hereinafter, the "Contract").[1]  Upon review, we affirm.

**Facts and Procedural History**

---

[1]  The Contract was admitted at trial as J.T. Thomas Homes' Exhibit 10 and the DeStefanos' Exhibit 1.  We cite directly to the contract for ease of review.

Pursuant to the Contract, in exchange for $576,000, J.T. Thomas Homes agreed to construct a new single-family dwelling on a lot separately purchased by the DeStefanos in the Fox Chase II development. Contract, ¶¶ 1, 5(A), 11. The home was to be custom built to the "Plans and Specification" described in paragraph one of the Contract, which included architectural drawings prepared by architect Bob Stevens and a "Description of Material" incorporated as exhibits into the Contract. *Id.*, ¶ 1. The DeStefanos financed the purchase by obtaining a construction loan from Washington Financial Bank ("Bank"). A payout schedule attached to the Contract specified the stages of construction and corresponding draw due upon J.T. Thomas Homes' completion of each stage, subject to review and certification of work by the DeStefanos and the Bank. *See id.*, ¶¶ 5, 11, 12, & Exhibit C.

J.T. Thomas Homes represented and warranted that it was "fully experienced and properly qualified as an expert in residential construction of the type described in the Plans and Specifications and that it is properly equipped, organized and financed to perform such work." *Id.*, ¶ 2. It also promised to "at all times exert its best efforts to complete construction at the earliest possible time and will at all times furnish sufficient labor and materials to assure the most efficient and expeditious construction progress giving due regard for the highest quality of workmanship." *Id.*, ¶ 4. It provided a one-year express warranty "against any loss or damage arising from any defects in materials or workmanship" for one-year post-occupancy, and disclaimed

any other express, implied, or oral warranties. *Id.*, ¶ 24. The DeStefanos or their agent had the "right to inspect the job from time to time," and "[s]hould any contract violations be noted," the DeStefanos agreed to promptly notify J.T. Thomas Homes in writing. *Id.*, ¶ 15.

The Contract further addressed defaults in performance by both parties. If the DeStefanos failed to pay J.T. Thomas Homes within seven days of the payment's due date, the Contract entitled J.T. Thomas Homes to apply all money paid and proceed with a civil action for breach of contract, or, if "construction is complete in all respects," to recover the balance of the "Final Purchase Price" plus twelve percent interest. *Id.*, ¶ 18(A). The Contract refers to three events constituting a default by J.T. Thomas Homes: (1) failure "to perform the work diligently," a defined contractual term of "an unexcused cessation of work for seven or more days"; (2) "damage or defect," which are undefined terms; or (3) failure "to perform the work or repair or replace the defect." *Id.*, ¶ 18(B). Upon any of these events, the DeStefanos, at their "sole option," may "recover the full cost of the completion, repair or replacement or to set off the same from any sums otherwise due" to J.T. Thomas Homes thereunder "or proceed with an action at law." *Id.*

The trial court found, and the certified record indicates, that the relationship between Jeff Thomas ("Thomas"), the owner of J.T. Thomas Homes, and the DeStefanos deteriorated several months after the project began, resulting in communications that were "increasingly contrary to a

productive contractor/client relationship." Trial Court Opinion, 12/23/2024, at 5. Although the Contract required the DeStefanos to timely make periodic selections to avoid construction delays, the DeStefanos delayed making their selections. *Id.* By mid-February 2020, they "largely stopped communicating with J.T. Thomas Homes and its vendors to further selections" and cancelled an order with an appliance vendor. *Id.*

J.T. Thomas Homes received the first five progress payments, but the DeStefanos refused to authorize the final three draws totaling $201,635 because of their increasing dissatisfaction with J.T. Thomas Homes and its work. *Id.* at 6-9. J.T. Thomas Homes, through Thomas and its counsel, requested payment from the DeStefanos several times, and eventually initiated litigation in July 2020. *Id.* at 6. Despite the strained relationship and pending litigation, J.T. Thomas Homes continued its work on the home for a time.[2] *Id.* Ultimately, J.T. Thomas Homes did not finish the job and the DeStefanos hired other contractors to complete work on the home. *Id.*

Relevant to this appeal, J.T. Thomas Homes alleged that the DeStefanos breached the Contract by failing to make timely selections and to pay the final draws. The DeStefanos brought counterclaims against J.T. Thomas Homes, alleging breach of contract, breach of implied warranty, and violations of the Unfair Trade Practices Consumer Protection Law ("UTPCPL").

---

[2] In March 2020, the COVID-19 pandemic temporarily halted construction.

Following a six-day bench trial, on December 23, 2025, the trial court entered a nonjury verdict awarding $9,406 to the DeStefanos and against J.T. Thomas Homes. In an accompanying opinion, the trial court explained that the DeStefanos' failure to make timely selections was not a material breach and would have only excused the timetable under which J.T. Thomas Homes was to complete the project. *See* Trial Court Opinion, 12/23/2024, at 8. The trial court found that J.T. Thomas Homes did not bring the home to final completion—the standard triggering full payment under the Contract—but it did complete work totaling $165,575. *Id.* at 6-9. Specifically, it completed the work detailed in the sixth progress payment relating to interior walls; most of the work specified in the seventh progress payment relating to trim, except for installing the garage door and granite; and some of the work required to receive the final draw. *Id.*

The trial court decided that most of "the lapses in workmanship" by J.T. Thomas Homes did not excuse the DeStefanos from its contractual obligation to pay for this work because the contractor could have corrected such lapses "through punch list and repair steps" if this had been provided by the DeStefanos. *Id.* at 7. However, the trial court decided that J.T. Thomas Homes' installation of the roof and the mortar joining the brick exterior "were fundamentally defective without viable correction," which triggered the DeStefanos' option in paragraph 18 of the Contract "to set off repair or replacement from any sums otherwise due to J.T. Thomas Homes." *Id.* at 7.

Specifically, the trial court found that the DeStefanos' evidence established: (1) "that the roofing was defective and constructed in a manner out of compliance with recommendations and warranty specifications"; (2) the repairs specified in M&Y Remodeling LLC's April 16, 2021 invoice (a total roof replacement) were required; and (3) the repairs cost the DeStefanos $36,521.00. *Id.* Additionally, the DeStefanos' evidence

> established that the entire home must be re-mortared. The testimony of Jeff Dzikoswki of Ski Masonry LLC on corrective action required and associated cost was compelling. The mortar work performed by J.T. Thomas Homes is full of voids. The photos plainly show sloppy work inconsistent with a high-end custom home. The haphazard workmanship is beyond a "messy mortar strike" requested or approved by [the DeStefanos]. The remediation of the defective work requires chiseling out existing mortar and pointing all brick on the entire house. This extensive repair work is at a cost of $138,460.00.

*Id.* at 7-8.

The trial court ruled that J.T. Thomas Homes' improper installation of the roof and mortar constituted "defective workmanship" in material breach of the Contract, which in turn excused the DeStefanos' complete performance of its duty to pay J.T. Thomas Homes for its work. *Id.* at 8. Because damages for breach of contract seeks to return the parties to the position they would have been in but for the breach, however, the trial court decided that the DeStefanos could not withhold payment from J.T. Thomas Homes for "proper work actually completed" while also seeking the "full amount of cover damages," i.e. the cost of correcting the defects by other contractors. *Id.* The court found that the costs to repair the defective roof work and mortar

work totaled $174,981. *Id.* at 9. When offset by the amount the DeStefanos would have paid J.T. Thomas Homes for the work it properly completed, $9,406 in damages remained. *Id.* at 8-9. The trial court concluded that the DeStefanos proved their entitlement to damages of $9,406, measured by the cost of repair, to compensate them for J.T. Thomas Homes' provision of defective work in breach of the Contract and the warranty. *Id.*

Each side filed post-trial motions. In a series of orders entered on March 6, 2025, the trial court denied J.T. Thomas Homes' post-trial motion in its entirety and granted the DeStefanos' motion only to the extent it molded the verdict to reflect pre-judgment interest for a total of $12,381.92. After the DeStefanos sought entry of judgment for this amount, J.T. Thomas Homes appealed to this Court.

**Issues on Appeal**

J.T. Thomas Homes raises the following issues on appeal:

1. Whether the trial court erred in finding J.T. Thomas Homes liable to the DeStefanos' counter-claim for mortar damage based solely on the aesthetic appearance of the mortar when a claim related to the masonry's appearance had not been pled and the only admitted evidence was that the DeStefanos had approved a representative sample of the mortar with the same appearance prior to installation[?]

2. Whether the trial court erred in considering the inadmissible "expert" testimony of Ski Masonry at trial after granting J.T. Thomas Homes' Motion for Limine, excluding any expert testimony by Ski Masonry and ruling that "Ski Masonry may be offered as a fact witness only[?]"

3. Whether the trial court erred in permitting the DeStefanos to submit evidence of alleged roof defects where the evidence

- 7 -

regarding the defects was destroyed when the DeStefanos replaced the entire roof without notice to J.T. Thomas Homes, thereby preventing J.T. Thomas Homes from having a roofing expert inspect the roof and develop a rebuttal opinion[?]

4. Whether the trial court erred in its application of the [UTPCPL §] 201-2(4)(xvi) without any evidence or expert testimony supporting a finding that the work performed on the Project was below the industry standard or the standard required under the Contract[?]

J.T. Thomas Homes' Brief at 6-7 (party designations substituted).

**Standard of Review**

In reviewing these issues, we are mindful of the following:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial court must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary. The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*El-Gharbaoui v. Ajayi*, 260 A.3d 944, 958 (Pa. Super. 2021) (citation omitted). Because it is the factfinder's job to assess credibility and conflicts in evidence in the first instance, our standard of review prohibits this Court from reexamining the factfinder's weight and credibility determinations or substituting our judgments for those of the factfinder. *Gutteridge v. J3 Energy Grp., Inc*., 165 A.3d 908, 916 (Pa. Super. 2017) (en banc). Instead

of considering whether we would have reached the same result, we decide whether the trial court reasonably reached its result based upon the evidence it found credible. *Id.*

We review specific challenges to the trial court's admission or exclusion of evidence for an abuse of discretion. *Parr v. Ford Motor Co.*, 109 A.3d 682, 690–91 (Pa. Super. 2014) (en banc). These questions "lie within the sound discretion of the trial court," and absent a clear abuse, we will not reverse. *Id.* at 690 (citation omitted).

> An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Id.* at 690-91 (cleaned up). We also apply an abuse-of-discretion standard to the trial court's discovery rulings, including rulings on claims of spoliation. *Marshall v. Brown's IA, LLC*, 213 A.3d 263, 267 (Pa. Super. 2019).

Interpreting a statutory provision presents a question of law, which we review de novo with a plenary scope. *Halpern v. Ricoh U.S.A., Inc.*, ___ A.3d ___, 2026 WL 898877, at *6 (Pa. 2026). We adhere to the tenets of the Statutory Construction Act, 1 Pa.C.S. §§ 1501-1991, including its directive "to ascertain and effectuate the intention of the General Assembly" by examining the plain, non-ambiguous statutory language as written. 1 Pa.C.S. § 1921(a), (b).

- 9 -

**Masonry Work**

J.T. Thomas Homes first argues, from a procedural standpoint, that the trial court erred by finding the masonry work defective based upon its aesthetic appearance because the DeStefanos premised their counterclaim upon the defective function of the mortar, not its appearance. J.T. Thomas Homes' Brief at 19-32. It cites cases setting forth the general proposition that a litigant must prove its case with evidence that corresponds to averments alleged. *See, e.g., id.* at 24 (citing **Pierson v. London**, 156 A. 719, 720 (Pa. 1931) ("The doctrine of variance requires a plaintiff to make out a case by proofs in substantial correspondence with the averments of the statement of claim."). By sua sponte interjecting aesthetics as an issue, J.T. Thomas Homes contends that the trial court deprived it of the opportunity to object or to present evidence that disproved the altered issue and awarded the DeStefanos relief for a claim that they did not plead. *Id.* at 28-32. Instead of finding that the mortar's function might fail and cause damages—the defect for which the DeStefanos sought relief in their counterclaim but did not prove at trial—J.T. Thomas Homes argues that the trial court found a defect in the workmanship solely based upon the affront to the trial judge's subjective taste and aesthetic sensibilities. *Id.* at 19-20.

It further claims that, substantively, the trial court erred by finding that the mortar was defective based upon its appearance as the DeStefanos' admitted that they requested a mortar strike with a rough appearance,

reviewed and approved a mockup of the mortar strike, and never complained that the mortar did not match the mockup. *Id.* at 33-34. In other words, what the trial court describes as a sloppy appearance is actually a feature of the atypical style of mortar strike that the DeStefanos selected for their custom home to satisfy their own aesthetic taste, not a bug in the installation impacting the function. *See id.* at 19-22.

Neither argument is convincing. By attempting to cabin the scope of the counterclaim's averments and the court's factual findings to entirely separate categories of function versus aesthetics, J.T. Thomas Homes misses the point that in this case, function and aesthetics are interrelated both as pled and as proven by the DeStefanos.

The DeStefanos' counterclaim averred that J.T. Thomas Homes "incorrectly installed the brick façade and mortar joints, which has resulted in improperly struck mortar joints throughout the entire brick façade"; this incorrect installation constituted a breach of the parties' Contract; and as a result of this and other breaches the DeStefanos suffered damages, "including the cost of correcting [J.T. Thomas Homes'] defective work, installing work consistent with the Contract and their selections and completing the construction of the home, plus interest." Amended Answer, New Matter and Counterclaim, 7/1/2021, at ¶¶ 129(f), 130. This is exactly what the trial court found. The defect at issue—the improper striking of the mortar—is visually evident from the sloppy work and many voids depicted by the photographs

and observed and described by the DeStefanos' witnesses. *See* Trial Court Opinion, 12/23/2024, at 8; *see also* N.T., 7/17-25/2024, at 633-35, 742-58. Nothing about the trial court's rationale indicates that it found the work to be sloppy based upon the aesthetic style; instead, in context, the trial court's reference to "the sloppy work inconsistent with a high-end custom home," refers to the function of the mortar, which "is full of voids." *See* Trial Court Opinion, 12/23/2024 at 8. J.T. Thomas Homes even acknowledged this understanding of the trial court's rationale in its post-trial motion and brief. *See* Post-Trial Motion, 12/27/2024, ¶ 21 (commenting that it appears that the trial court "is saying that while the DeStefanos requested a particular strike, they did not request a defective strike"); Post-Trial Brief in Support, 12/27/2024, at 4 (Conceding "that whatever mortar strike [the DeStefanos] purchased, they are entitled to mortar that is functional. That is, holds the bricks together and provides a watertight exterior to the home."). The trial court's finding that the installation of the mortar was "fundamentally defective without viable correction" is entirely consistent with the facts and claim pled (and proved) by the DeStefanos. *See id.*; *c.f. Anflick v. Gruhler*, 46 A.2d 161, 162 (Pa. 1946) (material variance between proof and pleadings because appellant sought "to recover, not under the contracts alleged but under another which was not pleaded").

Further, while J.T. Thomas Homes asserts that "it is difficult to overstate the extent to which [its] trial preparation and presentation of the case would

have been different if it knew that the appearance of the mortar strike would be at issue," J.T. Thomas Homes' Brief at 33, this argument strains credulity. The record, in fact, reflects that J.T. Thomas Homes defended against the claim by maintaining that it satisfied the standards established by the parties' contract and ordinary workmanship by applying the atypical but legitimate style of strike requested and approved by the DeStefanos. *See* N.T., 7/17-25/2024, at 205-09, 768-69 (collective testimony from Thomas and his residential construction expert, Gary Allen ("Allen"), that J.T. Thomas Homes simply applied an unusual but standard mortar joint style featuring an extruded or squeezed appearance that was requested and approved by the DeStefanos and did not need to be redone).

To the extent that J.T. Thomas Homes argues that the DeStefanos' selection and approval of an atypical mortar style bars them from claiming a defect in workmanship, it does not cite to, or base this argument upon, a particular contractual clause. *See* J.T. Thomas Homes' Brief at 33-34; J.T. Thomas Homes' Post-Trial Motion, 12/27/2024, ¶¶ 16-21, 27-29. Instead, its argument boils down to a mere challenge to the trial court's credibility determinations and weighing of the evidence.

Beyond asserting that the company's installation of a waterproof board behind the brick mitigated any water infiltration, Thomas offered very little to defend the company's work and focused upon discrediting the veracity of DeStefanos' "ridiculous complaint." *See* N.T., 7/17-25/2024, at 206-07.

Allen testified that the mortar did not need to be removed because it was a standard strike, the waterproof board behind it would act as a moisture barrier, and if there were concerns about waterproofing, a waterproof sealant could be applied. *Id.* at 765-70. Significantly, even Allen testified that he would "probably" apply the sealant regardless of specific concerns regarding water infiltration, undercutting Thomas' testimony that the DeStefanos' concerns about water infiltration were wholly unfounded. *Id.* at 769.

The DeStefanos' witnesses, on the other hand, testified that the voids (i.e., the holes) in between the bricks were the defect at issue. *See id.* at 634 (Anthony DeStefano's testimony that the "main real issue is the areas where there's no mortar. Yes, the excess is terrible as well, but the areas where there's no mortar, there's nothing there to prevent water from getting directly behind ... the brick."). Jeff Dzikowski ("Dzikowski") of Ski Masonry testified that Striking the mortar is important to avoid water from entering the brick, and when he inspected the property for the purpose of providing a quote for proposed repair work, he observed plainly visible voids "really everywhere in between the bricks." *Id.* at 748. It appeared to him that the "brick was laid and never properly struck," meaning that the "brick layers had laid the joint, the mortar, squeezed the brick down and then just cut the mortar off and never struck it." *Id.* at 742, 744. He described the actions his company would take "to rectify the issue with the un-struck mortar joints" (chiseling out the mortar and reapplying it throughout the entire exterior) and the price

his company quoted for performing this work ($138,460). *Id.* at 750, 755. He specifically testified, without objection, that even if the DeStefanos wanted a rough extruded look, there "are ways to make it look rough without compromising the integrity of the mason work," and that spraying a water sealant periodically to maintain the integrity of the mortar was not possible in this case. *Id.* at 797.

Presented with conflicting testimony, the trial court acted within its discretion in finding that the defect was not simply inherent in the style or that the DeStefanos acquiesced to this manner of installation. We cannot undermine the trial court's factual findings that enjoy record support. The trial court had discretion to assess credibility and resolve conflicts in evidence, and we cannot simply substitute our judgment for that of the trial court on this issue. *See Gutteridge*, 165 A.3d at 916. Thus, no relief is due on the first issue.

**Admission of Dzikowski's Testimony**

In its second issue, J.T. Thomas Homes argues that because the trial court referred to the testimony of Jeff Dzikowski of Ski Masonry as "compelling," it shows that the court improperly relied upon Dzikowski's testimony as expert testimony despite ruling that Dzikowski could testify only as a fact witness. J.T. Thomas Homes' Brief at 35-38. J.T. Thomas Homes argues that as a result, insufficient evidence remains to support the trial

court's findings in favor of the DeStefanos regarding masonry issues, requiring this Court to reverse the award regarding the masonry issues. *Id.* at 37.

As presented, the precise legal nature of this claim is unclear. In response to the DeStefanos' argument that the issue presents an unpreserved challenge to the sufficiency of the evidence,[3] J.T. Thomas Homes insists that it is not seeking sufficiency review and is instead challenging the court's "evidentiary rulings—namely, its decision to afford expert weight and status to testimony offered by lay witnesses." J.T. Thomas Homes' Reply Brief at 20.

Taking J.T. Thomas Homes at its word, we examine its argument through the lens of an evidentiary challenge, which, as stated, we review for an abuse of discretion. *Parr*, 109 A.3d at 690–91. Construed in this way, we examine whether the trial court abused its discretion by admitting Dzikowski's testimony that the masonry joints were improperly struck over J.T. Thomas Homes' objections that such testimony exceeded fact testimony. While J.T. Thomas Homes cites cases to support general legal concepts regarding the distinction between lay and expert testimony, it does not cite to the Rules of Evidence or Civil Procedure or offer any meaningful legal analysis to support

---

[3] In the very first line of J.T. Thomas Homes' summary of the argument, it proclaims that "[t]his is a case about the sufficiency of admissible evidence." J.T. Thomas Homes' Brief at 8. The DeStefanos highlight this assertion and argue that J.T. Thomas Homes waived a challenge to the sufficiency of the evidence by not moving for a nonsuit or a directed verdict before raising this claim in its post-trial motion. The DeStefanos' Brief at 8 (citing *Haan v. Wells*, 103 A.3d 60, 68 (Pa. Super. 2014)).

its argument that Dzikowski's testimony exceeded the scope of a lay witness and that the trial court abused its discretion in allowing such testimony. **See** J.T. Thomas Homes' Brief at 36-37. It simply asserts, without support, that "[k]nowledge of mortar strikes and the construction thereof lies outside the realm of lay knowledge, requiring a special skillset to perform and opine upon, thus necessarily requiring the opinion of an expert in order to establish that a mortar strike is defectively constructed and prove causation of damages." **Id.**

The line between expert and lay testimony when a witness possesses specialized knowledge can be difficult to discern. **See Deeds v. Univ. of Pennsylvania Med. Ctr.**, 110 A.3d 1009, 1017 (Pa. Super. 2015); **see also Commonwealth v. Yocolano**, 169 A.3d 47, 63 (Pa. Super. 2017) (deciding that testifying medical professionals "blurred the line between factual, lay-witness observations and expert testimony requiring specialized knowledge"). On the one hand, the "standard for qualifying an expert witness is a liberal one; the witness need only have a reasonable pretension to specialized knowledge on a subject for which expert testimony is admissible." **Risperdal Litig. W.C. v. Janssen Pharms., Inc.**, 174 A.3d 1110, 1122 (Pa. Super. 2017). As the purpose of expert testimony is to assist the trier of fact with information which the ordinary layman does not possess, an expert need only "possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience." **Miller v. Brass Rail Tavern, Inc.**, 664 A.2d 525, 528 (Pa. 1995).

On the other hand, there is no litmus test for what constitutes fact testimony as opposed to opinion. *Deeds*, 110 A.3d at 1017. "Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness'[] perceptions and helpful to a clear understanding of his or her testimony." *Id.* That a witness has technical expertise does not ipso facto convert a witness testifying about facts relating to technical knowledge into a witness offering an expert opinion based upon those facts. *See id.* at 1019 (ruling in medical malpractice suit that the trial court did not err by permitting a treating physician testifying as a fact witness to discuss the basis for his course of medical treatment to the patient, including his opinion derived from his review of her medical records that she did not have the medical condition at issue when she visited the hospital two days earlier, because he did not render any opinion as to whether the hospital violated a standard of care by failing to diagnose the condition during her first visit).

> [I]f all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as are witnesses possessed of special training, experience or observation, then there is no need for the testimony of an expert.

*Brandon v. Ryder Truck Rental, Inc.*, 34 A.3d 104, 108 (Pa. Super. 2011) (citation omitted).

Upon review of the certified record and J.T. Thomas Homes' argument, we discern no abuse of discretion in the trial court's admission of Dzikowski's

testimony. The record reflects that in response to J.T. Thomas Homes' motion in limine seeking to exclude Dzikowski from testifying as an expert, the DeStefanos asserted that he would testify only as a fact witness. N.T., 7/17-25/2024, at 40. At the inception of his testimony, the DeStefanos proffered that Dzikowki would testify regarding his observations of the masonry on the day he examined the home's exterior for the purpose of providing a proposal to fix any issues with the masonry, as well as the proposed work and price. *Id.* at 737. The trial court overruled J.T. Thomas Homes' objection that only an expert could provide testimony as to value. *Id.* at 738-39. J.T. Thomas Homes renewed its objection several more times, claiming that Dzikowski's descriptions of issues with the brick and proposed actions combined with his rationale crossed into expert territory. *Id.* at 742-43, 745, 748-49, 755-56. The trial court allowed the testimony, ruling that it was within the scope of his firsthand factual knowledge obtained to evaluate a proposed job. *Id.* It sustained some of J.T. Thomas Homes' objections, however, striking Dzikowski's testimony that was not about this specific project and admitting only his quote but not a report he authored. *Id.* at 747, 753-54.

On appeal, J.T. Thomas Homes' argument is tied to the inability of Dzikowski to opine as to whether the installation was "properly performed to industry standard or caused any potential damages." J.T. Thomas Homes' Brief at 37. Yet to trigger the default provisions under the parties' particular agreement, the DeStefanos simply had to prove the existence of a defect and

the cost of its chosen action of "repair, completion, or replacement." ***See***
Contract, ¶ 18. The language of the Contract left room for the DeStefanos to
prove a defect under a common understanding of imperfections in the work.

The home was new construction, meaning that only J.T. Thomas Homes
performed the work prior to the replacement. The evidence established that
the alleged defect persisted throughout the exterior and was visible to the
naked eye. Having visited the property to provide a quote for the professional
services his company would provide if hired to repair the mortar, Dzikowski
testified to what he saw, the actions that he would take if hired to fix the
defect, and his rationale.

Notwithstanding the imprecise line between expert and lay testimony,
J.T. Thomas Homes has not established that the trial court abused its
discretion in drawing the line where it did in its evidentiary rulings in this case
and then relying upon the admitted testimony in arriving at its conclusion
regarding the defects in masonry work. ***See Deeds***, 110 A.3d at 1017-19;
***Brandon***, 34 A.3d at 108.

## Spoliation

In its third issue, J.T. Thomas Homes argues that the trial court erred
by allowing the DeStefanos to admit evidence at trial concerning alleged
defects in the roof and refusing to sanction the DeStefanos for replacing the
roof without notice—an alleged spoliation of evidence. J.T. Thomas Homes'

Brief at 38-44. J.T. Thomas Homes argues that the trial court committed myriad errors in this regard, including:

- initially providing no detail regarding it did not impose sanctions;

- giving this issue short shrift in a footnote;

- overemphasizing J.T. Thomas Homes' firsthand knowledge of the roof given that its expert lacked access to the roof for an inspection;

- not considering that its only opportunity for its expert to inspect the roof was thwarted by winter conditions;

- relying on the existence of photographs that are not equivalent to in person access;

- ignoring that J.T. Thomas Homes was barred from the property once it had details about the DeStefanos' complaints; and

- failing to find that the DeStefanos had a high degree of intentional fault combined with a very prejudicial impact of spoliation.

*See* J.T. Thomas Homes' Brief at 38-44.

"'Spoliation of evidence' is the failure to preserve or the significant alteration of evidence for pending or future litigation." *Parr*, 109 A.3d at 701. If evidence relevant to a lawsuit is lost or destroyed, the trial court has discretion to impose a range of sanctions against the spoliator, including entry of judgment, exclusion of evidence, monetary penalties (such as fines and attorney fees), and adverse inference instructions to the jury. *Marshall*, 213 A.3d at 267.

When deciding whether a spoliation sanction is warranted, the trial court considers three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing

party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Mount Olivet Tabernacle Church v. Edwin L. Wiegand Div.*, 781 A.2d 1263, 1269-70 (Pa. Super. 2001), *aff'd per curiam*, 811 A.2d 565 (Pa. 2002) (citation omitted). In assessing the degree of fault, the court must consider "the extent of the offending party's duty or responsibility to preserve the relevant evidence, and the presence or absence of bad faith." *Parr*, 109 A.3d at 702 (citation omitted). A party has the duty to retain evidence when a party knows that litigation is pending or likely and it is foreseeable that discarding the evidence would prejudice the other party. *Marshall*, 213 A.3d at 268.

A party's "power to control the scene and to exercise authority over the preservation or destruction of evidence is a relevant factor in determining responsibility." *Mount Olivet Tabernacle Church*, 781 A.2d at 1271. However, "the scope of the duty to preserve evidence is not boundless." *Id.* At a minimum, in the absence of exigent circumstances, a party should provide the allegedly responsible party with the opportunity to inspect the evidence. *Id.* Ideally, the party should have the opportunity to conduct "a full and complete investigation, untainted by spoliation," but the court may also consider countervailing factors, such as a time-sensitive need of the plaintiff to correct the problem. *Id.* (noting that a plaintiff does not have the duty to

preserve an "unremediated fire scene[]" indefinitely because it poses "inherent instability and danger"). Likewise, while some prejudice inherently occurs when the party allegedly responsible is precluded from conducting its own independent investigation, such prejudice may be tempered by the party's ability to cross-examine the plaintiff's experts and to call its own experts to render opinions based upon the plaintiff's evidence. *Id.* at 1272.

The record reflects that J.T. Thomas Homes presented a motion in limine to exclude the DeStefanos from introducing any evidence at trial regarding a defective roof. It claimed therein that the DeStefanos violated its duty to preserve evidence by replacing the roof without notice after J.T. Thomas Homes had made them aware of its desire to have an expert inspect the roof. J.T. Thomas Homes' Motion in Limine, 9/3/2024, ¶¶ 9-22. In response, the DeStefanos argued that J.T. Thomas Homes had ample opportunity to inspect the roof prior to the installation of a new roof in April 2021, which it was required to do to make their home habitable. DeStefanos' Response in Opposition to Motion in Limine, 9/16/2024, ¶¶ 8, 10-18.

After reviewing the parties' written and oral arguments, the trial court denied the motion and declined to make a finding of spoliation. N.T., 12/17-25/2024, at 48. Because J.T. Thomas Homes was the party who performed the work in the first instance, it distinguished this situation from cases involving "a critical component that has gone missing" or "a significant change" preventing "the parties themselves" from knowing "what it looked

like in the first place." *Id.* It also cited, without elaboration, J.T. Thomas Homes' opportunity of inspection, access by an expert, and the degree of fault. *Id.*

J.T. Thomas Homes raised the issue again in its post-trial motion, arguing that the trial court erred by allowing evidence of the defective roof when J.T. Thomas Homes was deprived of its opportunity to have an expert inspect the roof. J.T. Thomas Homes' Post-Trial Motion, 12/27/2024, at ¶¶ 44-48. In response to the post-trial motion, the trial court reaffirmed its earlier ruling, concluding that "no sanction is warranted under the circumstances of the case," because "the manner of installation was within the knowledge" of J.T. Thomas Homes or those acting within its instruction and "numerous photographs exist depicting buckling and deficiencies in the roof." Trial Court Opinion, 12/23/2024, at 7 n.2.

It is apparent that the trial court was persuaded by the DeStefanos' argument that it had provided ample opportunity for J.T. Thomas Homes to arrange for an inspection. Nonetheless, J.T. Thomas Homes does not provide context to, or record citations for, its factual assertions regarding its opportunity to access the roof, let alone explain why the court's conclusion in this regard constituted an abuse of its discretion. *See, e.g.*, J.T. Thomas Homes' Brief at 40-41 (failing to explain why its expert purportedly only had a "single opportunity" to inspect the roof or cite to the record to support its assertion that the DeStefanos' counsel promised to schedule a site visit prior

to any work on the roof). In fact, much of J.T. Thomas Homes' argument on appeal is an attempt to argue its spoliation motion to this Court anew as opposed to providing reasons why the trial court abused its discretion in declining to award sanctions.

The trial court weighed factors—including J.T. Thomas Homes' knowledge of its manner of installation, photographic evidence of the alleged defects, the essential nature of a roof to the habitability of the home, and the elapse of months between the thwarted winter inspection and the replacement of the roof—to conclude that no sanctions for spoliation were warranted. That the trial court did not weigh these factors as J.T. Thomas Homes would have liked and ultimately failed to impose any sanction does not mean that it abused its discretion. **See, e.g., Mt. Olivet Tabernacle Church**, 781 A.2d at 1273 (holding that trial court's failure to impose any sanction for spoliation did not constitute an abuse of discretion; while the court would have acted within the bounds of its discretion by issuing an adverse inference instruction to the jury given the some fault by the plaintiff for failing to preserve a fire scene and some prejudice to the defendant of losing the opportunity to conduct its own independent investigation, its failure to do so was not so erroneous as to constitute an abuse of its discretion); **Hutchinson v. Verstraeten**, 304 A.3d 1268, 1274–75 (Pa. Super. 2023) (explaining that attempting to convince this Court that the lower tribunal's decision was

contrary to the decision that this Court would have reached falls short of arguing and establishing an abuse of discretion). No relief is due.

**UTPCPL**

In its fourth and final issue, J.T. Thomas Homes argues that section 201-2(4)(xvi) of the UTPCPL requires a deceptive or fraudulent practice, and having found neither, the trial court erred by finding that it violated the UTPCPL. J.T. Thomas Homes' Brief at 44-49. It argues that the trial court's finding "creates a slippery slope whereby any finding of defective work under a construction contract will create a form of strict liability under the UTPCPL." *Id.* at 44. According to J.T. Thomas Homes, the UTPCPL is designed to prevent fraud and deception, and in the absence of a finding of either, a contractor's failure to fulfill a homeowner's expectations regarding the quality of its work does not violate the UTPCPL. *Id.* at 47 (citing *Burkholder v. Cherry*, 607 A.2d 745, 749 (Pa. Super. 1992)). It claims that *Commonwealth v. Burns*, the case relied upon by the trial court, is inapposite on its facts because the contractor admitted performing substandard work, abandoned the project, and engaged in a pattern of using the incomplete status of projects to coerce consumers into paying additional money and not completing the work it had contractually agreed to perform. *Id.* at 46-47 (citing *Commonwealth v. Burns*, 663 A.2d 308, 311 (Pa. Cmwlth. 1995)). J.T. Thomas Homes argues that without expert testimony or evidence of fraud or deceptive practices, the

DeStefanos' evidence was insufficient to establish that its work on the roof or mortar failed to meet the industry or contractual standards. *Id.* at 47.

The DeStefanos contend that J.T. Thomas Homes is attempting to present an unpreserved challenge to the sufficiency of the evidence.[4] The DeStefanos' Brief at 8-9. In its reply brief, J.T. Thomas Homes claims the question before this Court "concerns the proper interpretation of the UTPCPL," requiring our de novo review of the statute. J.T. Thomas Homes' Reply Brief at 27. On this basis, we will again give J.T. Thomas Homes the benefit of review, ignoring the parts of its argument that do not pertain to the issue it claims to be presenting.[5] The "UTPCPL is Pennsylvania's consumer protection law." *Sereda v. Ctr. City Acquisitions, LLC*, 222 A.3d 1161, 1171 (Pa. Super. 2019). It prohibits "unfair or deceptive acts or practices." 73 P.S. § 201-2(4); *see also id.* § 201-3(a) (declaring unlawful certain "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"). The UTPCPL "is a remedial statute that should

---

[4] Alternatively, they assert that the trial court "soundly exercised its discretion." The DeStefanos' Brief at 14-15.

[5] This requires a fairly generous read of J.T. Thomas Homes' post-trial motion. The closest it comes to arguing an issue of statute interpretation therein is its argument that the UTPCPL requires an act that constitutes a finding of unfair methods of competition or deceptive practices. *See* Post-Trial Motion, 12/27/2024, ¶ 41. While we have addressed all of its arguments today on the merits, we remind counsel that appellate issue preservation serves an important function, and it requires specificity, consistency, and close adherence to the applicable standard of review. *See Garwood v. Ameriprise Fin., Inc.*, 240 A.3d 945, 949 (Pa. Super. 2020).

be construed broadly in order to comport with the legislative will to eradicate unscrupulous business practices." ***Gregg v. Ameriprise Fin., Inc.***, 245 A.3d 637, 641 (Pa. 2021). To establish a statutory claim under the UTPCPL, a person must demonstrate that:

> (1) they purchased or leased "goods or services primarily for a personal, family, or household purpose"; (2) they suffered an "ascertainable loss of money or property"; (3) the loss occurred "as a result of the use or employment by a vendor of a method, act, or practice declared unlawful by" the [UTPCPL]; and (4) the consumer justifiably relied upon the unfair or deceptive business practice when making the purchasing decision.

***Id.*** at 646 (quoting 73 P.S. §§ 201-8, 201-9.2(a)).

One such unfair method of competition and unfair or deceptive act or practice is "making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing." 73 P.S. § 201-2(4)(xvi). In a case involving a public action against a contractor, our sister court rejected the contractor's argument that, as a matter of law, its performance of substandard work could not constitute an unfair or deceptive business practice. ***Burns***, 663 A.2d at 310–11. Unlike ***Burkholder v. Cherry***, wherein the consumer was unable to prove fraud without representations by the contractor[6] or loss because the jury found that the contractor constructed the dwelling in a good and workmanlike manner, the UTPCPL violation at issue in ***Burns*** was based upon

---

[6] ***Burkholder*** does not specify which subsection of the UTPCPL it relied upon.

section 201-2(4)(xvi). *Id.* at 311 (citing **Burkholder**, 607 A.2d at 749). A section 201-2(4)(xvi) violation is established, the Commonwealth Court explained, when "a contractor agreed in writing to perform a contract with workmanship of good quality but is shown to have performed with substandard and inferior work." *Id.*

In the case at bar, the trial court determined that the DeStefanos met their burden of establishing a violation of section 201-2(4)(xvi).[7] Trial Court Opinion, 12/23/2024, at 9-10. The trial court found that J.T. Thomas Homes "agreed to 'exert its best efforts … to assure the most efficient and expeditious construction progress giving due regard for the highest quality of workmanship." *Id.* at 9 (quoting Contract, ¶ 4). Having "agreed in writing to perform a contract with workmanship of good quality," but performing "with substandard and inferior work," the trial court concluded that J.T. Thomas Homes technically violated section 201-2(4)(xvi). *Id.* (quoting **Burns**, 663 A.2d at 310–11). Despite J.T. Thomas Homes' engagement in an unfair or deceptive business practice in the technical sense—providing defective workmanship when installing the roof and mortar that fell short of the written

---

[7] The trial court determined that the DeStefanos did not meet their burden of establishing that J.T. Thomas Homes violated section 201-2(4)(xxi), the UTPCPL's catch-all provision. Trial Court Opinion, 12/23/2024, at 9; *see also **Gregg**, 245 A.3d at 649 (describing 73 P.S. § 201-2(4)(xxi) as a "catch-all provision" that "imposes liability on commercial vendors who engage in conduct that has the potential to deceive and which creates a likelihood of confusion or misunderstanding").

standard it agreed to provide—the trial court declined to award attorneys' fees or treble damages because J.T. Thomas Homes' conduct was not intentional, reckless, or fraudulent. *Id.* at 10. Although J.T. Thomas Homes did provide defective workmanship, the contentious litigation ensued because of the parties' mutual communication breakdowns, not because of any deception by J.T. Thomas Homes. *Id.*

Nothing in the statutory language of section 201-2(4)(xvi) requires a party to prove that the contractor engaged in fraud or deception beyond conduct that meets wording of the statute. *See Gregg*, 245 A.3d at 651 (courts must apply the language as written and not add requirements to a statute that the legislature chose not to include). Likewise, subsection (xvi) contains no requirement the consumer present expert testimony or demonstrate that the contractor failed to meet the industry standard. To prove that a contractor engaged in an "unfair method of competition and unfair or deceptive act or practice" pursuant to section 201-2(4)(xvi), the consumer needs to prove that the contractor made "repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing." 73 Pa.C.S. § 201-2(4)(xvi). The provision of work that is substandard to the contractor's

agreed-upon written standard is the unfair or deceptive act,[8] and this, along with the other required elements, serves to establish a statutory UTPCPL claim. *See Burns*, 663 A.2d at 310–11.

Its attempt to distinguish *Burns* fails; that the contractor engaged in a pattern of using the incomplete status of projects to coerce consumers into paying additional money and not completing the work it had contractually agreed to perform was the basis of the Commonwealth Court's finding of liability under the catchall provision in section 201-2(4)(xvii), not section 201-2(4)(xvi). *Id.* Instead, the basis of its section 201-2(4)(xvi) liability it was the contractor's failure to perform work in accordance with its promised standard, which required abiding by a specified building code, use of new materials, and provision of "good quality" workmanship and materials. *Id.*

Because none of J.T. Thomas Homes' arguments establish that the trial court incorrectly construed section 201-2(4)(xvi), no relief is due.

**Conclusion**

---

[8] J.T. Thomas Homes' policy-based argument fails to contemplate that strict liability for "any finding of defective work under a construction contract" very well may be the point of section 201-2(4)(xvi), at least when the contractor provides work that falls short of its own contractual standard. *See Mitchell v. Megill Homes, Inc.*, 262 A.3d 558, at *5-6 (Pa. Super. 2021) (non-precedential decision) (deciding that because section 201-2(4)(xvi) does not have an explicit state-of-mind requirement like certain other definitions of unfair or deceptive conduct, the General Assembly intended to create strict liability for contractors) (citing *Gregg*, 245 A.3d at 650).

Based on the foregoing, we conclude that: (1) the breach-of-contract claim relating to mortar proved by the DeStefanos' comported with the claim raised in its counterclaim and the trial court did not abuse its discretion in weighing the conflicting evidence before it; (2) the trial court did not abuse its discretion by permitting the fact testimony provided by the mortar contractor; (3) the trial court did not abuse its discretion in declining to sanction the DeStefanos for alleged spoliation; and (4) the trial court did not err in its construction of section 201-2(4)(xvi) of the UTPCPL. We affirm.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/15/2026